

**Sealed**

Public and unofficial staff access
to this instrument are
prohibited by court order.

United States Courts
Southern District of Texas
FILED

JUN 1 8 2009

Michael N. Milby, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Cr. No.   **H-09-335** |
| | § | |
| JAMES M. DAVIS | § | **UNDER SEAL** |

**UNSEALED PER ORDER**
6/19/09

## INFORMATION

The United States Attorney Charges:

At all times material to this Information, unless otherwise specified:

### COUNT ONE
### Conspiracy to Commit Mail, Wire and Securities Fraud
### (Violation of 18 U.S.C. § 371)

## RELEVANT PERSONS AND ENTITIES

1.     Stanford Financial Group (SFG) was the parent company of Stanford International Bank, Ltd. and a web of other affiliated financial services entities, including Stanford Group Company. SFG maintained offices in several locations, including Houston, Texas, Memphis, Tennessee, and Miami, Florida.

2.     Stanford International Bank, Ltd. (SIBL) was a private, offshore bank with offices on the island of Antigua and elsewhere. SIBL was organized in or about 1985 in Montserrat, originally under the name of Guardian International Bank. In or about 1989, SIBL's principal banking location was moved to Antigua.

1

3.    SIBL's primary investment product was marketed as a "Certificate of Deposit" (CD). SIBL marketed CDs to investors promising substantially higher rates of return than were generally offered at banks in the United States from 2001 to 2008. In its 2007 Annual Report to investors, SIBL purported to have approximately $6.7 billion worth of the CD deposits and over $7 billion in total assets. In its December 2008 Monthly Report, SIBL purported to have over 30,000 clients from 131 countries representing $8.5 billion in assets.

4.    Stanford Group Company (SGC), a Houston-based company, was founded in or about 1995. SGC was registered with the Securities and Exchange Commission (SEC) as a broker-dealer and investment advisor.  SGC was also a member of the U.S. Securities Investor Protection Insurance Corporation (SIPIC). Although SGC and the financial advisers employed by SGC promoted the sale of SIBL's CDs through SGC's 25 offices located throughout the United States, SIBL's CDs were not insured by SIPIC or the Federal Deposit Insurance Corporation (FDIC).

5.    In Antigua, SIBL was purportedly regulated by the Financial Services Regulatory Commission ("FSRC"), an agency of the Antiguan government, and was subject to annual on-site inspection by the FSRC.  The FSRC claimed on its website that it conducted these inspections to determine the solvency of the banks, review the quality of the investments, and review the accuracy of the banks' returns.  Annually,

2

SIBL provided to the FSRC an "Analysis of Investments" report which listed purported values for SIBL's investments.   FSRC did not, however, audit SIBL's financial statements or verify the value SIBL ascribed to its investments in the Analysis of Investments.

6.    Defendant **JAMES M. DAVIS** was the Chief Financial Officer (CFO) for SFG and SIBL, and served as a member of SIBL's Investment Committee. **DAVIS**, among other things, regularly consulted with ROBERT ALLEN STANFORD about the financial status of SIBL; made investment decisions for SIBL; received regular updates on SIBL's revenue and loss records; made decisions, based on the direction of ROBERT ALLEN STANFORD, about what revenue and asset numbers to report to investors and others; updated investors and others about the financial status and operations of SIBL; and approved reports to investors and others about the financial condition of SIBL.

7.    Conspirator ROBERT ALLEN STANFORD controlled SFG and its affiliated companies, including, through a holding company, SIBL.   STANFORD was the chairman of the SIBL Board of Directors and a member of SIBL's Investment Committee. STANFORD, among other things, received regular updates and financial reports on the investment activities of SIBL; made hiring decisions for SIBL; made decisions about what revenue and asset numbers to report to investors and others;

3

made investment decisions for SIBL; updated investors and others about the activities and financial status of SIBL; and approved reports to investors and others about the financial condition of SIBL. STANFORD also authorized SIBL to make loans to himself and authorized SIBL to purchase property from STANFORD-controlled entities and to sell property to STANFORD-controlled entities.

8.    Conspirator LAURA PENDERGEST-HOLT was the Chief Investment Officer (CIO) of SFG. In or about December 2005, HOLT was appointed by the SIBL Board of Directors as a member of SIBL's Investment Committee. HOLT, among other things, held herself out to investors, employees of SIBL and SFG, and others as managing the entire investment portfolio of SIBL; updated investors and employees of SIBL and SFG regarding the financial status of SIBL; provided information about SIBL's investment portfolio to SFG and SGC financial brokers; and supervised SFG research analysts.

9.    Conspirator GILBERTO LOPEZ was the Chief Accounting Officer of SFG. LOPEZ, among other things, was responsible for tracking SIBL revenues, assets and liabilities, and was responsible for the preparation of the revenue and asset numbers used in SIBL's financial reports.

10.    Conspirator MARK KUHRT was the Global Controller for Stanford Financial Group Global Management, an affiliate of SFG and SIBL. KUHRT, among

4

other things, maintained calculations of investment revenue of SIBL and, along with LOPEZ, was responsible for the preparation of the revenue and asset numbers used in SIBL's financial reports.

11.    Conspirator LEROY KING was the Administrator and Chief Executive Officer for the FSRC.  KING, among other things, was responsible for Antigua's regulatory oversight of SIBL's investment portfolio, including the review of SIBL financial reports for the Antiguan Government, and the response to requests by foreign regulators, including the SEC, for information and documents about SIBL's operations.

## **BACKGROUND**

### **SIBL's Investment "Program"**

12.    STANFORD, **DAVIS**, HOLT, LOPEZ, KUHRT and others managed, marketed and monitored SIBL's CD investment program.  The defendants and other conspirators caused investors and potential investors in SIBL CDs to receive a Disclosure Statement, amended several times over the years, and other documents providing information regarding SIBL, including data purportedly depicting SIBL's historical investment portfolio performance by specific categories of investment and updating SIBL investors on the financial condition of SIBL.

13.    In promoting the SIBL CDs to investors, STANFORD, **DAVIS** and HOLT represented and caused others to represent: (a) the safety and security of SIBL's investments and CDs; (b) consistent double-digit returns on the bank's investment portfolio; and © high return rates on the SIBL CDs that greatly exceeded those offered by commercial banks in the United States.

14.    STANFORD, **DAVIS**, HOLT, LOPEZ, KUHRT and others caused to be sent to investors Annual Reports purportedly representing SIBL's earnings from its "diversified investments." For example, the annual report listed investment earnings of approximately $479 million in 2006, and approximately $642 million in 2007.

15.    Commencing in or about 2000, STANFORD sought to increase sales of SIBL CDs in the United States. To do so, SGC recruited investment advisors, along with their clients, from other brokerage firms. Financial advisors at SGC would receive a 1% commission based upon the value of CDs they sold, and were eligible to receive additional commissions for CD sales. STANFORD, **DAVIS** and HOLT provided and caused to be provided information to these financial advisors about the financial condition of SIBL and the SIBL CDs.

16.    SIBL investors and potential investors were *not* advised of the actual investments made by SIBL and could not determine the nature and risk of investments. Unknown to investors, the defendant and his conspirators internally

6

segregated its investment portfolio into three investment tiers: (a) cash and cash equivalents ("Tier I"); (b) investments with "outside portfolio managers" ("Tier II"); and © other assets ("Tier III").

17.   According to internal SIBL documents, as of June 30, 2008: Tier I investments represented only about 9% of the purported total value of SIBL's investments; Tier II investments represented only about 10% of the purported total value of SIBL's investments; and Tier III investments represented more than 80% of the purported total value of SIBL's investments.

18.   SIBL's Treasurer ("the SIBL Treasurer") had primary responsibility for the Tier I cash and cash equivalent investments.

19.   Unknown to investors, SGC financial advisors and others, HOLT "monitored" only Tier II investments, which were actually managed by well-known investment entities outside of SIBL that had complete discretion over the Tier II investments.  SIBL would provide funds for investments to these "outside portfolio managers," also referred to as "money managers," and the money managers would select how funds would be invested for Tier II, that is, what investments would be made, limited by the funds available to them.

20.   STANFORD and **DAVIS** directed, managed, and monitored the remaining investments – the Tier III investments.  According to internal SIBL

documents, as of June 30, 2008, these Tier III investments comprised the majority of the purported value of SIBL's investment portfolio. Approximately 50% of the purported value of Tier III (approximately $3.2 billion) included investments in artificially valued real estate and approximately 30% of the purported value of Tier III (approximately $1.6 billion) included notes on personal loans to STANFORD. STANFORD, **DAVIS** and others did not disclose to, and actively concealed from, investors, SGC and SIBL employees, and others the fact that approximately $4.8 billion in purported Tier III investments consisted of such artificially valued real estate and notes on personal loans to STANFORD.

21.    In its Monthly Report to investors for December 2008, SIBL reported total assets of over $8 billion, and an approximate 1.3% decline in earnings for the year, which the Monthly Report contrasted with the performance of other financial indices reporting approximately 30% to 40% declines. As set forth above, it was not disclosed in the Report that approximately $4.8 billion of the purported $8 billion "value" of these "total assets" was in notes on additional loans to STANFORD and in the interests in the "island properties," the values of which had been grossly overstated.

8

## Marketing of SIBL CDs

22.    STANFORD, **DAVIS**, HOLT and others routinely made presentations to financial advisors employed by SGC regarding the financial condition of SIBL and its investment portfolio.  The SGC financial advisors would then provide information to prospective investors regarding the CD investment program.

23.    STANFORD, **DAVIS** and HOLT, at times,  made presentations directly to individuals or groups of prospective investors regarding SIBL's CD program and to existing investors who were considering additional CD purchases or redemptions of their CDs.

24.    STANFORD regularly sponsored "Top Producers Club" (TPC) meetings, which were held at various locations, including January 2009 meetings in Phoenix and Miami, and were attended by financial advisors and others.  At these TPC meetings, STANFORD, **DAVIS**, HOLT  and others would tout the purported economic condition and viability of SIBL to instill confidence in the CD investment program and encourage the financial advisors to aggressively market and sell SIBL's CDs.

25.    STANFORD, **DAVIS**, HOLT and others, on behalf of SIBL, also would review and cause the issuance of SIBL's periodic Annual, Quarterly and Monthly Reports, which would be provided to investors and would be used by SGC's financial

advisors in marketing SIBL's CDs.  In marketing the CDs as safe and secure investments, the financial advisors and SIBL's brochures, reports and other documents variously emphasized that SIBL was "strong, safe and fiscally sound" and that its investment strategy was a "conservative approach" and "long term, hands on and globally diversified with strong liquidity and minimal leverage."

### SEC Investigation

26.    In or about 2005, the SEC initiated an investigation of SFG and began making official inquiries with the FSRC regarding the value and content of SIBL's purported investments.

27.    In June 2005, the SEC confidentially requested the assistance of KING at the FSRC in determining whether SIBL and SFG had "perpetrated a fraud upon investors."

28.    In September 2006, the SEC confidentially requested from KING at the FSRC, among other things, copies of "the FSRC's exam reports" regarding SIBL.

29.    In or about January 2009, the SEC issued subpoenas to STANFORD, **DAVIS** and HOLT seeking both testimony and documents regarding SIBL's investment portfolio.

30.     In late January 2009, the SEC notified SIBL's attorney that the SEC had scheduled sworn testimony of the SIBL President and HOLT to provide "credible and verifiable testimony regarding all of the assets" of SIBL.

31.     On or about February 10, 2009, HOLT attended an SEC proceeding in Fort Worth, Texas, and provided sworn testimony to the SEC regarding SIBL's investment portfolio.

32.     On or about February 16, 2009, the SEC filed a Complaint seeking emergency relief against SFG and related individuals and entities in the United States District Court for the Northern District of Texas ("the District Court"), alleging a "massive, on-going fraud." In its Amended Complaint, filed February 27, 2009, the SEC further alleged "misappropriation of billions of dollars of investor funds" and other fraudulent conduct.

33.     On or about February 17, 2009, the District Court appointed an individual – known as a Receiver – to take over SFG and its related entities to protect and preserve their investments and assets.

## THE CONSPIRACY

34.    From in or about at least September 1999, through on or about February 17, 2009, in the Southern District of Texas and elsewhere, the defendant,

## JAMES M. DAVIS,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with ROBERT ALLEN STANFORD, LAURA PENDERGEST-HOLT, GILBERTO LOPEZ, MARK KUHRT, LEROY KING, and with others, known and unknown to the United States, to commit certain offenses against the United States, that is:

(a) to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and causing to be delivered certain mail matter by the United States Postal Service and any private or commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1341;

(b) to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when

12

made, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343; and

(c) to, by use of the means and instrumentalities of interstate commerce, the mails, and wire communications, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, that is, certificates of deposit of the Stanford International Bank, Ltd. and in connection with such transactions, (i) employ devices, schemes, and artifices to defraud holders of the securities; (ii) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engage in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon holders of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5.

## PURPOSE OF THE CONSPIRACY

35.    It was a purpose of the conspiracy that the defendant and his conspirators would solicit and obtain billions of dollars of investors' funds through false pretenses, representations and promises, all in order to obtain substantial economic benefits for

themselves and others through the payment of fees, wages, bonuses, and other monies, and unauthorized diversions, misuse, and misappropriation of funds.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and his conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

36.    It was a part of the conspiracy that the defendant and his conspirators would make and cause to be made false and misleading representations in promotional materials, periodic reports, newsletters, emails sent by mail and wire transmissions in interstate commerce to investors and others, and in conversations, presentations and meetings with investors and others, including the following:

**False Statements Regarding the Value of SIBL's Finances:**

a.    The defendant and his conspirators would make and cause to be made false and misleading representations concerning SIBL's financial condition touting year-by-year percentage and dollar amount increases in the purported value of its earnings, revenue, and assets, including an increase in the purported value of SIBL's assets from approximately $1.2 billion in 2001 to approximately $8.5 billion in December 2008, when, in truth and in fact, those values were false and designed

to deceive investors into believing that SIBL's "investments" were performing as falsely touted.

**False Statements Regarding SIBL's Investment Strategy and Use of Investors' Funds**:

b.    The defendant and his conspirators would make and cause to be made false and misleading representations concerning SIBL's investment strategy as seeking to "minimize risk and achieve liquidity," when, in truth and in fact, approximately 80% of SIBL's investment portfolio consisted of illiquid investments, such as (I) grossly overvalued real and personal property that SIBL had acquired from STANFORD-controlled entities through fraudulent "round trip" transactions and (ii) unsecured notes on more than a billion dollars in personal loans to STANFORD.

**False Statements Regarding the Management of Investors' Funds**:

c.    STANFORD, **DAVIS**, HOLT  and others would make false and misleading misrepresentations that SIBL's entire investment  portfolio was closely and well-managed, including identifying HOLT as SFG's "Chief Investment Officer" and as a member of SIBL's "Investment Committee," responsible for management of SIBL's entire portfolio of assets through a "global network" of "outside portfolio managers" and "money managers," when, in truth and in fact, HOLT ultimately "managed" less than approximately 10% of SIBL's investment portfolio.

**False Statements Regarding Oversight by Antiguan Regulators**:

d.     STANFORD, **DAVIS**, KING and others would make false and misleading representations regarding the nature and extent of regulatory oversight of SIBL, including that SIBL's operations and financial condition were being scrutinized by the FSRC in Antigua and that SIBL's financial statements were subject to annual audits and regulatory inspections by Antiguan regulators, when, in truth and in fact, STANFORD had made corrupt payments to KING in order to ensure that the FSRC did not accurately audit SIBL's financial statements or verify the existence or value of SIBL's assets as reflected in the SIBL financial statements.

37.     It was further a part of the conspiracy that the defendant and his conspirators would create and cause to be created false and misleading accounting books and records and other documents concerning the financial condition and investment portfolio of SIBL, through, among other things, the following means:

a.     The defendant and his conspirators would create false books and records containing artificial values for SIBL's investment portfolio and its return on investment by causing already inflated values that had been reported to investors for prior periods to be adjusted (multiplied) by a percentage increase "as deemed necessary" to produce the new false investment and revenue values.

b.    The defendant and his conspirators would conceal and disguise as "investments" in SIBL's books and records, and fail to disclose in such books and records, that STANFORD had received and not repaid more than a billion dollars of personal loans from SIBL.

c.    The defendant and his conspirators would conceal and disguise in SIBL's books and records fraudulent "roundtrip" transactions in which SIBL would transfer interests in real and personal property to STANFORD-controlled entities and then back to SIBL at grossly inflated values, in order to mask the artificially inflated values of those "assets" on SIBL's books and records, to falsely disguise and purportedly "settle" a substantial portion of the loans STANFORD had taken from SIBL, and to falsely inflate the value and disguise the nature of STANFORD's purported capital contributions to SIBL.

38.    It was further a part of the conspiracy that STANFORD would make regular secret corrupt payments of thousands of dollars in cash to KING, the Administrator and CEO of the FSRC, to ensure that, among other things:

a.    The FSRC would not exercise its true regulatory functions in verifying the existence and value of SIBL's investments;

b.    KING corruptly would provide to STANFORD, **DAVIS** and others information about official inquiries that the FSRC had received from United

States regulators who had requested information from the FSRC regarding "possible fraud perpetrated upon investors" by SIBL; and

      c.    KING would make false representations in response to official inquiries of regulators, including U.S. regulators, and would seek and receive the assistance of STANFORD, **DAVIS** and others, in preparing false responses to such inquiries.

      39.    It was further a part of the conspiracy that STANFORD, **DAVIS**, HOLT and others would conceal from the SEC the true operations and financial condition of SIBL, and the true nature and value of its holdings, and would forestall the SEC's investigation through various means, including, among others, the following:

      a.    STANFORD, **DAVIS**, HOLT and others would make and cause to be made false and misleading statements to SEC attorneys in order to persuade them to delay the sworn testimony of STANFORD and **DAVIS** by falsely representing that HOLT and SIBL's President could better explain specific details about SIBL's entire investment portfolio and assets rather than STANFORD and **DAVIS**; and

      b.    HOLT would attend the SEC proceeding in Fort Worth, Texas, on February 10, 2009, at which HOLT would provide false sworn testimony regarding

SIBL's investment portfolio, her knowledge of the portfolio, and her preparation for her testimony.

## OVERT ACTS

40.    In furtherance of the conspiracy and to achieve its objects and purpose, at least one of the conspirators committed and caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

a.    In or about April 2000, STANFORD and **DAVIS** caused to be sent to investors SIBL's Annual Report for 1999, which included representations that SIBL's total assets at year end 1999 were up 28.75% to $675.89 million with a $3.81 million profit;

b.    In or about April 2001, STANFORD and **DAVIS** caused to be sent to investors SIBL's Annual Report for 2000, which included representations that SIBL's total assets at year end 2000 were up 22.84% to $830.70 million with profit up 31.61% to $5.01 million;

c.    In or about April 2002, STANFORD and **DAVIS** caused to be sent to investors SIBL's Annual Report for 2001, which included representations that SIBL's total assets at year end 2001 were up 44.19% to $1.198 billion with a record profit up 142.59% to $12.16 million;

d.      In or about April 2003, STANFORD and **DAVIS** caused to be sent to investors SIBL's Annual Report for 2002, which included representations that SIBL's total assets at year end 2002 were up 43.1% to $1.7 billion with a record operating profit up 97.9% to $23.7 million, and which included a "Report of Management" signed by STANFORD and **DAVIS** representing that the financial statements presented "fairly and consistently the Bank's financial position and results of operations";

e.      In or about March 2004, STANFORD and **DAVIS** caused to be sent to investors SIBL's Annual Report for 2003, which included representations that SIBL's total assets at year end 2003 were up 29.9% to $2.2 billion with a record operating profit up 39.7% to $36.2  million, and which included a "Report of Management" signed by STANFORD and **DAVIS**;

f.      In or about March 2005, STANFORD and **DAVIS** caused to be sent to investors and placed on SIBL's website SIBL's Annual Report for 2004, which included representations that SIBL's total assets at year end 2004 were up 38.7% to $3.1 billion with a fifth consecutive year of operating profit, reaching $36.2 million, and which also included a "Report of Management" signed by STANFORD and **DAVIS**;

g.    In or about March 2006, STANFORD and **DAVIS** caused to be sent to investors and placed on SIBL's website SIBL's Annual Report for 2005, which included representations that SIBL's total assets at year end 2005 were up 31.5 percent to $4.1 billion, and which also included a "Report of Management" signed by STANFORD and **DAVIS**;

h.    On or about October 10, 2006, KING provided to the SEC an official response of the FSRC regarding SIBL, which response contained text actually prepared by STANFORD and others;

i.    On or about January 11, 2007, KUHRT sent an email from Houston, Texas, to **DAVIS** in Tupelo, Mississippi, with a copy to LOPEZ in Houston, Texas, attaching an artificial revenue entry for December 2006 and noting that the SIBL president was looking for financials that he could present at the Top Producers Club event;

j.    In or about April 2007, STANFORD and **DAVIS** caused to be sent to investors and placed on SIBL's website SIBL's Annual Report for 2006, which included representations that SIBL's total assets at year end 2006 were up 31.5% to $5.3 billion with an operating profit of $28.8 million, and which also included a Report of Management signed by STANFORD and **DAVIS**;

21

k.    On or about April 16, 2007, KUHRT sent an email from Houston, Texas, to **DAVIS** in Tupelo, Mississippi, with a copy to LOPEZ, in Houston, Texas, which attached the falsely inflated March 2007 revenue entry;

l.    In or about April 2008, STANFORD and **DAVIS** caused to be sent to investors SIBL's Annual Report for 2007, which included representations that SIBL's total assets grew by 32.3% to $7.1 billion and that the bank earned a record operating profit of $43.6 million, and which also included a Report of Management signed by STANFORD and **DAVIS**;

m.    On or about April 8, 2008, KUHRT caused an SFG employee to send a fax from Houston, Texas, to **DAVIS** in Tupelo, Mississippi, which sought **DAVIS**'s review and approval of artificial amounts to insert in the monthly report for SIBL's "Return on Investment" for March 2008 and asked what figures to reduce with the understanding that year-to-date income "should be about $1.8 million loss";

n.    On or about April 8, 2008, **DAVIS** caused a reply fax to be sent from Tupelo, Mississippi, back to an SFG employee in Houston, Texas, subject: "SIBL Accrual for Approval MAR 2008," in which **DAVIS** provided handwritten instructions regarding the need to "reduce equity" to "come in line with" a $1.8M loss;

22

o.     In or about December 2008, STANFORD, **DAVIS**, HOLT and others caused to be sent to investors SIBL's Monthly Report for December 2008, which falsely represented that SIBL had received a "capital infusion" of $541 million from STANFORD;

p.     In or about January 2009, **DAVIS** instructed SIBL's Treasurer to destroy SIBL records which had been moved to Antigua;

q.     On or about January 23, 2009, at a meeting between SIBL's attorney and an SEC Staff Attorney at SFG's offices in Houston, Texas, SIBL's attorney requested that the SEC Staff Attorney defer the SEC subpoenas to STANFORD and **DAVIS** and represented that HOLT and the SIBL President would be better witnesses than STANFORD and **DAVIS**, whom SIBL's attorney claimed were executive level officers of the company not involved in the "nuts and bolts" of the company and who could not to tell the SEC attorneys about details of the bank's assets;

r.     On or about February 10, 2009, prior to HOLT's testimony before the SEC, **DAVIS** spoke by telephone with HOLT regarding her planned testimony at the SEC proceeding;

s.     On or about February 10, 2009, HOLT and SIBL's attorney attended an SEC proceeding in Fort Worth, Texas, at which HOLT provided sworn

23

testimony to the SEC in which she (1) did not disclose the Miami meetings to prepare her testimony; and (2) represented that she did not know specifically the nature and allocation of assets in Tier III; and

t.      On or about February 11, 2009, HOLT caused funds in the amount of approximately $4.3 million to be sent by wire transfer from the Bank of New York to SIBL's operating account at the Bank of Houston in Houston, Texas.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### Mail Fraud
### (18 U.S.C. §§ 1341 and 2)

1.      Paragraphs 1 through 33 of Count One of this Information are re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or about at least September 1999, the exact date being unknown, through on or about February 17, 2009, in the Southern District of Texas, and elsewhere, the defendant,

### JAMES M. DAVIS,

aided and abetted by others known and unknown to the United States, did knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent

pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made.

## PURPOSE OF THE SCHEME AND ARTIFICE

3.    It was a purpose of the scheme and artifice that the defendant and his co-schemers would solicit and obtain billions of dollars of investors' funds through false pretenses, representations and promises, all in order to obtain substantial economic benefits for themselves and others through the payment of fees, wages, bonuses, and other monies, and unauthorized diversions, misuse, and misappropriation of funds.

## SCHEME AND ARTIFICE

4.    Paragraphs 36 through 39 of Count 1 of this Information are re-alleged and incorporated by reference herein as a description of the scheme and artifice.

## USE OF THE MAIL

5.    On or about the date specified below, the defendant, for the purpose of executing the aforesaid scheme and artifice to defraud and attempting to do so, knowingly deposited and caused to be deposited the matters and things listed below to be sent and delivered by the United States Postal Service:

| COUNT | APPROX. DATE | DESCRIPTION |
|-------|--------------|-------------|
| 2 | November 30, 2008 | Mail matter containing a purported SIBL account statement for Investor TA sent and delivered via United States Postal Service to Investor TA's address in Spring, Texas. |

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT THREE
### Conspiracy to Obstruct SEC Investigation
### (Violation of 18 U.S.C. § 371)

1.    Paragraphs 1 through 33 of Count One of this Information are re-alleged and incorporated by reference as though fully set forth herein.

2.    From in or around 2005, the exact date being unknown, through in or around February 17, 2009, in the Southern District of Texas and elsewhere, the defendant,

**JAMES M. DAVIS,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with ROBERT ALLEN STANFORD, LAURA PENDERGEST-HOLT, LEROY KING and with others known and unknown to the United States, to commit certain offenses against the United States, that is: to corruptly influence, obstruct and impede and endeavor to

influence, obstruct and impede, in whole or in part, a pending proceeding before any department and agency of the United States of America, that is, the Securities and Exchange Commission ("SEC"), in violation of 18 U.S.C. § 1505.

## PURPOSE OF THE CONSPIRACY

3.    It was a purpose of the conspiracy that the defendant and his conspirators would corruptly influence, obstruct and impede the SEC's investigation of SFG and SIBL, including the SEC's efforts to ascertain SIBL's true financial condition and the content and value of SIBL's investment portfolio, all in an effort to, among other things, perpetuate and prevent detection of an ongoing fraud and continue receiving economic benefits from the fraud.

## MANNER AND MEANS OF THE CONSPIRACY

4.    Paragraphs 38 and 39 of Count One of this Information are re-alleged and incorporated by reference as though fully set forth herein as a description of the manner and means by which the defendant and his conspirators sought to accomplish the objects and purpose of the conspiracy.

## OVERT ACTS

5.    The acts alleged in parts h, p, q, r, s and t of Paragraph 40 of Count One of this Information are re-alleged and incorporated by reference as though fully set forth herein as overt acts at least one of the conspirators committed and caused to be

committed, in the Southern District of Texas and elsewhere, in furtherance of the conspiracy and to achieve the objects and purpose thereof.

All in violation of 18 U.S.C. § 371.

## NOTICE OF FORFEITURE
## 28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(c)

Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(c), the United States gives notice to the defendant

### JAMES M. DAVIS,

that in the event of conviction of the offenses charged in Counts One and Two of this Information, the United States intends to forfeit all property, real or personal, which constitutes or is derived from proceeds traceable to mail fraud or conspiracy to commit mail, wire and securities fraud.

### Money Judgment

Defendant is further notified that in the event of conviction the United States will seek a money judgment in an amount up to $1 billion pursuant to Title 18, United States Code, Section 981(a)(1)(c), for which the defendant may be jointly and severally liable.

### Substitute Assets

In the event that property subject to forfeiture, as a result of any act or omission of any of the defendant

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property that cannot be divided

without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the

defendants up to $1 billion, pursuant to Title 21, United States Code, Section 853(p),

iincorporated by reference in Title 28, United States Code, Section 2461(c)

TIM JOHNSON
United States Attorney

BY: _____

GREGG COSTA
Assistant United States Attorney

STEVEN A. TYRRELL
Chief
Fraud Section, Criminal Division
U.S. Department of Justice

BY: _____

PAUL E. PELLETIER
Principal Deputy Chief
JACK B. PATRICK
Senior Litigation Counsel
MATTHEW KLECKA
Trial Attorney
U.S. Department of Justice
Fraud Section, Criminal Division